**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Blue Compass RV LLC, | No. CV-24-03704-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Michael McFadden, et al., | |
| Defendants. | |

    Defendants Michael McFadden and Zachary LeDuc were previously employed by plaintiff Blue Compass RV LLC. In the last few months, McFadden and LeDuc left Blue Compass and formed a new company, Camper Capital, LLC, that competes with Blue Compass in the sale and installation of camper shells. McFadden still has possession of some of Blue Compass's confidential information, although he claims he has not accessed that information since leaving. Blue Compass seeks a temporary restraining order and preliminary injunction that would, in effect, prohibit McFadden, LeDuc, and Camper Capital from conducting business. The present record does not establish Blue Compass is entitled to the early relief it seeks.

**I.    Background**[1]

    Blue Compass describes itself as "the fastest-growing RV retail company in history." (Doc. 1 at 3.) It has locations across the United States, including six in Arizona

---

[1] Some of these facts are drawn from the complaint. That complaint is not verified, and its factual assertions would not be admissible in their current form. At this preliminary stage, however, the court may consider inadmissible evidence. *See, e.g.*, *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024).

and one in New Mexico. The locations are "full-service RV dealerships," selling vehicles such as motorhomes. (Doc. 7 at 2.) The locations, including three in the Phoenix metropolitan area, also sell "new and used camper shells, truck bed covers, and truck caps," which Blue Compass refers to collectively as "camper shells." (Doc. 1 at 2.) Sometime in early 2024, Blue Compass hired Michael McFadden as its "Market Vice President – Southwest." (Doc. 7 at 3.) In that role, McFadden had management responsibilities over the locations in Arizona and New Mexico. (Doc. 7 at 3.) On April 21, 2024, McFadden executed an "Employee Covenants Agreement." For present purposes the crucial sections of that agreement are numbered two, four, five, and six.[2]

Section two of the agreement states McFadden was required to return any "confidential information" in his possession within five business days of the end of his employment. (Doc. 20-1 at 1-2.) The agreement defined "confidential information" as all information "of a private, secret, proprietary or confidential nature" concerning Blue Compass and its operations. (Doc. 20-1 at 1.)

Section four of the agreement consists of an "Acknowledgment Regarding Company's Business." (Doc. 20-1 at 4.) That section identifies Blue Compass as "engaged in the selling, leasing, advertising, marketing, financing, storing, repairing and servicing of new and used Recreational Vehicles." The section contains a special definition for "Recreational Vehicles": "all brands and types of motorhomes, towable travel trailers, fifth wheels, toy haulers, pop-up campers, truck campers, tear drop trailers, and any other type of vehicle or trailer sold, leased or serviced by [Blue Compass]." (Doc. 20-1 at 4.) Section four also acknowledges Blue Compass "may engage in additional related businesses or in separate and distinct businesses from time to time." (Doc. 20-1 at 4.)

Section five of the agreement, titled "No Solicitation/No-Hire," addresses both Blue Compass's customers and employees. It provides that for 24 months after the end of his

---

[2] The agreement contains a choice-of-law provision requiring application of Florida law. (Doc. 20-1 at 8.) That provision also has a forum selection clause stating all disputes "shall be instituted only in the state or federal courts located in Broward County, in the state of Florida." (Doc. 20-1 at 8.) Neither party has invoked that forum selection clause, but Blue Compass believes the choice-of-law clause should apply such that Florida law governs the reach of the agreement. (Doc. 1 at 14.)

employment, McFadden cannot employ any person who had been an employee of Blue Compass at any time for the "then-prior six (6) months." (Doc. 20-1 at 4.) Section 5 also prohibits McFadden from "solicit[ing] or induc[ing] any customer of [Blue Compass] to patronize any business directly or indirectly in competition with the businesses conducted by [Blue Compass]" and prohibits McFadden from encouraging a "vendor . . . to withdraw, curtail or cancel" its business with Blue Compass. (Doc. 20-1 at 4.)

Section six is titled "Agreement Not to Compete." (Doc. 20-1 at 4.) It prohibits McFadden from "directly or indirectly . . . selling, leasing, designing, manufacturing, advertising, marketing, financing, storing, repairing or servicing . . . any new or used Recreational Vehicles" or engaging "in any additional related or other business that [Blue Compass] or any subsidiary or affiliate of [Blue Compass] engaged in at any time." (Doc. 20-1 at 5.) These limitations apply for 12 months after the end of his employment and are geographically limited to 100 miles within "any dealership or office within the geographic area over which [McFadden] had business responsibilities" or within 75 miles of any Blue Compass dealership. (Doc. 20-1 at 5.)

While employed by Blue Compass, McFadden attended "the University of Michigan Ross School of Business executive leadership program." (Doc. 7 at 3.) During that program, McFadden led "Blue Compass's Camper Shell expansion initiative." (Doc. 7 at 4.) That initiative involved McFadden working with "Blue Compass's senior finance leaders . . . to identify areas for growth and expansion" regarding camper shell sales. (Doc. 7 at 4.)

McFadden's pay from Blue Compass was based, at least in part, on commissions. According to McFadden, Blue Compass often miscalculated his commissions and he had to independently calculate how much he was owed. To do so McFadden "emailed [himself] Blue Compass's Monthly Operating Reports because they show net profits." (Doc. 18-1 at 6.) Those reports do not include the name of Blue Compass's customers or employees, nor do they "reveal any business strategies or the like." (Doc. 18-1 at 6.) According to McFadden, it was not unusual for him to have access to the Monthly Operating Reports.

Blue Compass's Pacific Region President texted the reports to McFadden almost every month of McFadden's employment, sometimes to his personal cellphone. (Doc. 18-1 at 6.)

The parties have not identified when LeDuc began working for Blue Compass but until shortly before this suit was filed, LeDuc worked as "Blue Compass RV's General Sales Manager for its Mesa, Arizona dealership." (Doc. 7 at 11.) In that role, LeDuc was responsible for the sale and installation of camper shells to individuals and other companies. LeDuc "developed close relationships with Blue Compass's fleet/commercial customers who purchase Camper Shells in bulk for fleet vehicles." (Doc. 7 at 12.) LeDuc never signed an agreement like the one signed by McFadden.

As of October 2024, McFadden and LeDuc were both employed by Blue Compass. On October 23, 2024, LeDuc filed Camper Capital's articles of organization for a limited liability company. (Doc. 7 at 2.) Those articles listed LeDuc as the sole member and manager. (Doc. 7 at 2.) Around that same time McFadden was having conversations with Blue Compass's Vice President and Chief Human Resources Officer, Taylore Elliott. McFadden claims that on three different occasions, Elliott stated McFadden's agreement prohibited him "from working in the Recreational Vehicle – as defined by the restrictive covenant agreement – industry." (Doc. 18-1 at 5.) Elliott allegedly stated McFadden "did not need permission from Blue Compass to work in the automotive (which includes truck shells)" industry. (Doc. 18-1 at 5.) Elliott admits she exchanged emails with McFadden prior to his departure but does not explain the content of those emails. (Doc. 7 at 6.)

McFadden resigned from Blue Compass on November 30, 2024. In doing so he executed a Separation Agreement that required he return all of Blue Compass's confidential information in his possession. (Doc. 1 at 10.) On December 6, 2024, McFadden amended Camper Capital's articles of organization to reflect that both he and LeDuc were members and managers. (Doc. 7 at 2.) LeDuc resigned from Blue Compass on December 19, 2024. (Doc. 18-1 at 11.) At present, McFadden and LeDuc are running Camper Capital at a single location in Phoenix, Arizona.

Camper Capital "deals in truck accessories exclusively, including truck shells,

which are also known as camper shells – the protective enclosures placed over beds of pickup trucks that are accessories to trucks." (Doc. 18-1 at 4.) Camper Capital recently signed "Manufacturer Agreements" with "three leading Camper Shell manufacturers." (Doc. 7 at 13.) Before those agreements, "Blue Compass was the only full-service RV dealership in Arizona to sell Campers Shells from all three of these leading manufacturers." (Doc. 7 at 13.) Thus, Blue Compass believes Camper Capital is in direct competition regarding the sale and installation of camper shells from the same manufacturers as Blue Compass.

After resigning from Blue Compass, McFadden has not solicited any Blue Compass customers or employees. (Doc. 18-1 at 6.) McFadden still has possession of Monthly Operating Reports but has not accessed them after resigning from Blue Compass. (Doc. 18-1 at 6.)

On December 23, 2024, Blue Compass filed its complaint against McFadden, LeDuc, and Camper Capital. (Doc. 1.) The complaint alleges eight claims against various combinations of defendants. The claims and defendants are:

1. Violation of the Defend Trade Secrets Act—all defendants;
2. Breach of contract—McFadden;
3. Breach of fiduciary duties—McFadden and LeDuc;
4. Conspiracy—all defendants;
5. Aiding and abetting a breach of fiduciary duty—all defendants;
6. Tortious interference with business expectancy—all defendants;
7. Tortious interference with contract—LeDuc and Camper Capital;
8. Unfair competition—all defendants.

On December 27, 2024, Blue Compass filed its motion for temporary restraining order and preliminary injunction. (Doc. 8.) That motion recites most of the facts set forth above and seeks a somewhat strange mix of injunctive relief.

Blue Compass's motion explicitly identifies the relief it seeks by referencing the proposed injunction filed at the same time as the motion. The proposed injunction would

require defendants allow an independent forensic examiner to access their electronic devices to determine whether defendants possess any of Blue Compass's confidential information. (Doc. 9-1 at 3.) The injunction would also prohibit defendants from soliciting any of Blue Compass's customers or hiring any of Blue Compass's employees. (Doc. 9-1 at 4.) Finally, the injunction would prohibit McFadden, and only McFadden, from operating or owning "a Recreational Vehicle franchise or dealership." (Doc. 9-1 at 4-5.) For purposes of its proposed relief, Blue Compass defines "Recreational Vehicle" using the same definition contained in McFadden's agreement. (Doc. 9-1 at 5 n.2.)

The peculiarity of this requested relief is highlighted by Blue Compass specifically seeking to prevent McFadden from operating a "Recreational Vehicle franchise or dealership." In opposing Blue Compass's motion, defendants focused on their belief that camper shells do not qualify as "Recreational Vehicles." Thus, defendants argued no injunction was appropriate because Camper Capital does not qualify as a "Recreational Vehicle franchise or dealership." Blue Compass's reply seems to admit defendants are correct by shifting its focus and seemingly requesting relief beyond what was originally requested. According to the reply, McFadden's agreement prohibits him from working in the Recreational Vehicle business or "*any* business in which Blue Compass [also] engages." (Doc. 20 at 2.)

**II.    Analysis**

    **A. Standard for Early Injunctive Relief**

A court must analyze a request for a temporary restraining order or preliminary injunction under two slightly different tests. First, a court must evaluate if there is a likelihood of success on the merits, if there is a likelihood of irreparable harm, whether the balance of equities tips in plaintiff's favor, and whether an injunction would be in the public interest. *Winter v. Natural Resources Defense, Inc.*, 555 U.S. 7, 20 (2009). A court must also assess whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies*

- 6 -

*v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

## B. Likelihood of Success or Serious Questions

Blue Compass argues it is likely to succeed or there are serious questions going to the merits on all of its claims. Based on the available evidence and defendants' failure to respond to certain arguments, Blue Compass has made the requisite showing except for its claim under the Defend Trade Secrets Act.

### i. Defend Trade Secrets Act ("DTSA")

Blue Compass's first claim is for misappropriation of trade secrets under the DTSA. "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020). These elements turn on very specific definitions set forth in the DTSA and Blue Compass has not established those definitions cover the present situation.

It is not clear which "trade secrets" are at issue but the most likely candidates are the Monthly Operating Reports. Those reports are the only potential trade secrets Blue Compass clearly identifies in its filings. For purposes of this order, Blue Compass has waived any argument that other information, such as McFadden's general knowledge of the camper shell industry, should be treated as trade secrets.

To qualify as "trade secrets" under the DTSA, Blue Compass would have to show it took "reasonable measures to keep [the reports] secret" and the reports "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means." 18 U.S.C. § 1839(3). The declaration in support of Blue Compass's motion states the reports contain information "unique to the business of Blue Compass, highly confidential, and not available from any other source." (Doc. 7 at 10.) But there are no specifics regarding the measures Blue Compass took to keep the reports secret. Similarly, the declaration states the reports would be "invaluable to a competitive entity." (Doc. 7 at 10.) But there is no further explanation

why that is the case.

Assuming the reports qualify as trade secrets, the second element of a DTSA claim requires evidence defendants misappropriated those trade secrets. DTSA provides a special definition of "misappropriation" that requires acquisition through "improper means" or disclosure or use of the trade secret without consent. 18 U.S.C. § 1839(5)(A), (B). Blue Compass alleges defendants "continue to possess and access" the reports. (Doc. 1 at 14.) That may be enough to state a claim for relief, but McFadden has declared the reports have "zero strategic relevance to truck shells." (Doc. 18-1 at 6.) And McFadden states he has not "used or disclosed" the reports after leaving Blue Compass. (Doc. 18-1 at 6.) Blue Compass did not provide any contrary evidence establishing defendants likely are accessing and using the information. Accordingly, the present record does not establish the requisite misappropriation.

Assuming the reports are trade secrets and defendants misappropriated them, there is no evidence McFadden's continued retention of the reports has caused or threatened damage to Blue Compass. Again, McFadden has declared the information he possesses has no relevance to Camper Capital and Blue Compass has not provided any evidence contradicting that. At present, there is not a sufficient evidentiary basis to conclude McFadden's possession of the reports has caused or threatened harm.

Having failed to establish any of the three elements required for a DTSA claim, Blue Compass has not shown a likelihood of success nor has it established serious questions going to the merits.

### ii. Breach of Contract

Blue Compass's breach of contract claim is brought against only McFadden. According to Blue Compass, McFadden is violating the terms of the Employee Covenants Agreement regarding competing with Blue Compass, employing LeDuc, soliciting customers and vendors, and retaining or using the reports. (Doc. 8 at 11.) Blue Compass also believes McFadden's retention of the reports violates his Separation Agreement. Blue Compass is partially correct.

McFadden's Employee Covenants Agreement prohibits him from competing in the Recreational Vehicle business, as that term is defined in the agreement. The agreement also prohibits competition "in any additional related or other businesses that [Blue Compass] engages in at any time." (Doc. 20-1 at 5.) It is undisputed that Blue Compass and Camper Capital are both in the camper shell business. Based on the present record and the very limited briefing provided by the parties, Blue Compass has a strong likelihood of success on this aspect of its breach of contract claim.[3] This likelihood of success, however, is tempered in this context by the fact that Blue Compass's original motion sought relief only regarding the Recreational Vehicle business. That is, Blue Compass's original motion did not even seek relief under the language Blue Compass now cites as, and which may be, crucial to its likelihood of success outside of the preliminary injunction posture.

McFadden's Employee Covenants Agreement also prohibits him from directly or indirectly employing anyone who had been employed by Blue Compass in the previous six months. (Doc. 20-1 at 4.) Blue Compass believes McFadden is violating this provision by "continuing to employ LeDuc at Camper Capital." (Doc. 8 at 11.) Both McFadden and LeDuc are identified as members and managers of Camper Capital. Blue Compass has not explained whether all members or managers of a limited liability company qualify as employees of that company. And there is reason to doubt that is accurate. *See, e.g.*, A.R.S. § 29-3304 (Arizona's Limited Liability Company Act listing member, manager, and employee separately). Blue Compass has not established LeDuc is "employ[ed] by" Camper Capital within the meaning of McFadden's Employee Covenants Agreement. Therefore, Blue Compass has not established a likelihood of success or serious questions going to the merits on this aspect of its breach of contract claim.

McFadden's Employee Covenants Agreement prohibits him from soliciting customers of Blue Compass and prohibits him from requesting or encouraging any of Blue Compass's vendors from "withdraw[ing], curtail[ing], or cancel[ing]" business with Blue Compass. (Doc. 20-1 at 4.) Blue Compass has not provided any evidence that McFadden

---

[3] Neither party has provided briefing on how agreements such as McFadden's are treated under Florida law.

- 9 -

is soliciting Blue Compass's current customers, nor has it provided any evidence that McFadden is acting in a prohibited fashion regarding Blue Compass's relationships with its vendors. The parties agree Camper Capital has executed agreements with some of Blue Compass's vendors, but there is no evidence those vendors have stopped doing business with Blue Compass as a result. Based on the available evidence, Blue Compass does not have a strong likelihood of success on this aspect of its breach of contract claim.

Finally, McFadden's Employee Covenants Agreement and Separation Agreement prohibit his retention of Blue Compass's confidential information, as that term is defined in the agreements. It is undisputed McFadden has possession of the monthly reports. Assuming those reports qualify as confidential information, there is a strong likelihood Blue Compass will succeed on this aspect of its breach of contract claim.

Overall, Blue Compass appears likely to succeed on at least some aspects of its breach of contract claim.

### iii. Breach of Fiduciary Duties

Blue Compass's breach of fiduciary duty claim is brought against McFadden and LeDuc. Blue Compass believes the evidence "clearly establishes that McFadden and LeDuc breached their fiduciary duties of loyalty, utmost good faith, and a high degree of care" because they planned the launch of Camper Capital during their employment at Blue Compass. (Doc. 8 at 12.) Defendants did not address this argument in their opposition, so the court assumes Blue Compass has a strong likelihood of success. The court notes, however, that "preparation to compete is not enough to support a breach of fiduciary duty claim." *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1053 (D. Ariz. 2010). The limited evidence provided by Blue Compass therefore may not have been sufficient if defendants had addressed this claim.

### iv. Tortious Interference

Blue Compass brings a claim for tortious interference with business expectancy against all defendants and a claim for tortious interference with contract against LeDuc and Camper Capital. Blue Compass argues the evidence "firmly establishes" defendants

"tortiously interfered with McFadden's Employment Agreement with Blue Compass and Blue Compass's business expectancy with its existing and prospective customers." (Doc. 8 at 12.) Again, defendants do not respond to this argument and the court assumes Blue Cross has a strong likelihood of success on both of these claims.

### C. Likelihood of Irreparable Harm

Having established Blue Compass is likely to succeed on at least some claims, the next issue is whether Blue Compass has established a likelihood it will suffer irreparable harm. Blue Compass claims it is likely to suffer such harm in the form of damage "to its future business expectancy, competitive position in the marketplace, customer relationships," and loss of confidential information. (Doc. 8 at 13.) Without any meaningful elaboration of how these alleged harms justify injunctive relief, it appears these harms are simple economic harm.

"[E]conomic harm is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). But "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). In other words, a "threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *Id.* Here, Blue Compass has provided no evidence it might be driven out of business by Camper Capital such that the economic harm it fears should be deemed irreparable.

The Ninth Circuit has noted some intangible injuries, such as injury to a business's goodwill, may qualify as irreparable. *See, e.g.*, *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Blue Compass's harms, such as damage to its "customer relationships," may be alluding to these intangible injuries. But Blue Compass has not explained how these intangible injuries are likely to occur. At the very least, Blue Compass has not provided "specific evidence that its reputation and goodwill [are] likely to be irreparably harmed." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 761 (9th Cir. 2018).

Finally, a finding of irreparable injury is appropriate "where the underlying injury does not readily lend itself to calculable money damages." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023). For example, irreparable injury may exist where damages can only be calculated after a "protracted and speculative inquiry." *Id.* In the present case, McFadden's noncompete obligations expire 12 months after the end of his employment, approximately eleven months from now. (Doc. 20-1 at 5.) Blue Compass has not explained why it would be inordinately difficult to calculate the damages it suffers during such a discrete and relatively short period of time.

### D.  Balance of Equities

While the lack of irreparable harm is fatal to Blue Compass's request for relief, the balance of equities also weigh against granting relief. The court must "weigh the damage to each [party] in determining the balance of the equities." *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 852 (9th Cir. 2019) (quotation marks and citation omitted). The "damage to each" is measured as "the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Blue Compass argues refusing an injunction will cause grave harm to its future business expectancy and competitive position in the marketplace. (Doc. 8 at 13.) But as set forth above, it is not clear Blue Compass is suffering such harm at present. Blue Compass has 100 RV dealerships across the country and has not explained how much of its business is attributed to camper shells. Defendants contend camper shells are "not the heart of [Blue Compass's] business, not even close," and Blue Compass does not dispute that in its reply. (Doc. 18 at 12.) If only a small fraction of Blue Compass's business involves camper shells, it is not clear how Blue Compass as a whole will suffer the serious harm it alleges. In brief, refusing an injunction places Blue Compass at risk of suffering minor setbacks to a small portion of its business.

As for defendants, Blue Compass believes Camper Capital is not entitled to operate at all. McFadden and LeDuc represent that an injunction would prevent them "from making

a living," and Blue Compass does not dispute this point. (Doc. 18 at 13.) An injunction has a likelihood of imposing significant economic harm on defendants.

Withholding an injunction places Blue Compass at risk of suffering minor harm but granting an injunction may decimate defendants. The balance of equities favors defendants.

### E. Public Interest

The final factor the court must consider is the public interest. The requested injunction would reach only to the present parties. "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009). Blue Compass argues an injunction would serve the public interest because if one is not issued, "a contract would have no meaning in the State of Arizona." (Doc. 8 at 14.) The court is skeptical that withholding an injunction in this particular case, at this particular time, will result in Arizona becoming a contract-free zone. But more importantly, withholding an injunction will not affect Blue Compass's other contract-based remedies. For example, defendants may still be found liable and required to pay monetary damages. The public interest does not support either party.

### F. Balance

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Blue Compass has established a likelihood of success or serious questions going to the merits on some of its claims. But Blue Compass has not made a sufficient showing it will suffer irreparable harm, the balance of equities tip strongly in favor of defendants, and the public interest does not support either party. Based on the present record, a preliminary injunction is not merited.[4]

The analysis in this order turns on the limited arguments and limited record presented by the parties at this stage. Blue Compass is free to renew its motion if it can present more convincing evidence supporting irreparable injury and the balance of equities.

---

[4] McFadden appears to concede he is not entitled to retain possession of the reports. Based on that, he should consider negotiating their immediate return.

Defendants, and especially McFadden, should keep in mind that Blue Compass has shown a likelihood of success on some of its claims. That creates a significant possibility that at some point, defendants will be subject to an injunction or monetary damages, and they should tailor their behavior and plans accordingly.

**IT IS ORDERED** the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 8) is **DENIED**.

Dated this 16th day of January, 2025.

Honorable Krissa M. Lanham
United States District Judge