**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Blue Compass RV LLC, | No. CV-24-03704-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| Michael McFadden, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff Blue Compass RV LLC's ("Blue Compass") Renewed Application for Preliminary Injunction, (Doc. 70). Defendant Michael McFadden has responded, (Doc. 85), and Blue Compass has replied, (Doc. 89). For the reasons stated below, the application will be denied.[1]

## I.    BACKGROUND

The parties are familiar with the underlying facts, which are outlined in the January 16, 2025 order denying Blue Compass's first application for a temporary restraining order and preliminary injunction. (*See* Doc. 22.) Blue Compass is an RV retail company, which has locations across the United States, including six in Arizona and one in New Mexico.[2] (Doc. 1 at ¶ 19.) While primarily engaged in the sale and servicing of RVs, Blue

---

[1]    The parties did not request oral argument, and the Court does not believe oral argument is necessary. *See* LRCiv 7.2(f).

[2]    Some of these facts are drawn from the complaint. The complaint is not verified, and its factual assertions are inadmissible. But the Court may consider inadmissible evidence to resolve a preliminary injunction. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024).

Compass's Arizona and New Mexico locations also sell "new and used camper shells, truck bed covers, and truck caps," which Blue Compass refers to collectively as "camper shells." (*Id.* at ¶ 10.)

In April 2024, Blue Compass hired McFadden as its "Market Vice President" for the southwest region. (*Id.* at ¶ 15.) McFadden signed an employment agreement which included three provisions relevant here. (*Id.* at ¶ 24.)

The "non-competition provision," prohibited McFadden from competing with Blue Compass during, or for one year after his employment. Specifically, McFadden is prohibited from "directly or indirectly . . . selling, leasing, designing, manufacturing, advertising, marketing, financing, storing, repairing or servicing . . . any new or used Recreational Vehicles" or engaging "in any additional related or other business that [Blue Compass] or any subsidiary or affiliate of [Blue Compass] engaged in at any time." (Doc. 70 at 134.) The agreement defines the scope of Blue Compass's business as "the selling, leasing, advertising, marketing, financing, storing, repairing and servicing of new and used Recreational Vehicles." (*Id.* at 133.) Recreational Vehicles are defined as "all brands and types of motorhomes, towable travel trailers, fifth wheels, toy haulers, pop-up campers, truck campers, tear drop trailers, and any other type of vehicle or trailer sold, leased or serviced by [Blue Compass]." (*Id.*) The non-competition provision is geographically limited to 100 miles within "any dealership or office within the geographic area over which [McFadden] had business responsibilities" or within 75 miles of any Blue Compass dealership." (*Id.* at 134.)

The "non-solicitation provision," prohibits McFadden from hiring Blue Compass employees or soliciting its customers during or for two years after his employment. McFadden may not employ any person who was an employee of Blue Compass at any time for the "then-prior six (6) months," nor may he "solicit or induce any customer of [Blue Compass] to patronize any business directly or indirectly in competition with the business conducted by [Blue Compass]" or encourage a "vendor . . . to withdraw, curtail, or cancel" its business with Blue Compass. (*Id.* at 133)

- 2 -

Finally, the "confidentiality provision," requires McFadden keep certain information confidential and return confidential information to Blue Compass within five business days of his termination. (*Id.* at 132.) Confidential information includes all information "of a private, secret, proprietary or confidential nature" concerning Blue Compass and its operations. (*Id.*)

While at Blue Compass, McFadden "was a high-ranking employee," who was "responsible for leading Blue Compass's Camper Shell expansion initiative." (Doc. 70 at 4.) McFadden "worked directly with Blue Compass's senior finance leaders to analyze the Monthly Operating Reports and Profit and Loss statements related to Blue Compass's Camper Shell sales to identify areas for growth and expansion." (*Id.* at 5.)

On November 30, 2024, McFadden resigned from his role at Blue Compass. (*Id.* at 12.) When he resigned, McFadden signed a "Separation Agreement," which reiterated his obligation to return confidential information to Blue Compass. (*Id.* at 7.) Roughly a week later, McFadden became a member and manager of Camper Capital LLC, ("Camper Capital") which sells truck shells and accessories in Phoenix and Mesa, Arizona. (*Id.* at 12.)

Camper Capital was formed in Arizona in October 2024 by Michael LeDuc, also a former Blue Compass employee and defendant in this suit. (*Id.*) At the time of formation, LeDuc was the sole member of Camper Capital, and was still working for Blue Compass as a general sales manager for its Mesa, Arizona dealership. (*Id.*) While working for Blue Compass, LeDuc interacted with and developed Blue Compass's relationships with three leading camper shell manufacturers in Arizona and "was effectively the face of Blue Compass's Camper Shell business." (Doc. 1 at ¶ 48.) LeDuc did not sign any employment or separation agreements with Blue Compass, and thus is not subject to the same competition, solicitation, and confidentiality provisions as McFadden. (*See id.* at ¶ 47–51.)

After leaving Blue Compass, LeDuc and McFadden launched Camper Capital in the Phoenix area. (Doc. 70 at 13.) Blue Compass alleges that at least some of their preparation

to launch Camper Capital occurred while they were still employed by Blue Compass.  (*Id.*)
Since it opened, Camper Capital has established relationships with the same three camper
shell manufacturers that Blue Compass works with, and, as a result, "offer[s] the same
products from the same manufacturers in the same market as Blue Compass."  (Doc. 70 at
52.)  Defendants do not dispute that this fact.  (*See* Doc. 22 at 9 ("It is undisputed that Blue
Compass and Camper Capital are both in the camper shell business."); *see generally* Doc.
85.)

To promote Camper Capital, LeDuc and McFadden purchased several Google
keywords to direct internet traffic to Camper Capital's website.  (Doc 70 at 17.)  Purchased
keywords included "Camperland," "truck shells," "topper," "cap," "canopy," "camper
shell," "bed covers," "tonneau covers," "used campershells," and "campershells near me."[3]
(*See* Doc. 70 at 67.)

On December 23, 2024, Blue Compass filed this suit, bringing claims against
Defendants for violation of the Defend Trade Secrets Act ("DTSA"), breach of contract,
conspiracy to violate the DTSA, breach of fiduciary duty, and other related claims.  (*See*
Doc. 1 at 13–18.)  Blue Compass sought a Temporary Restraining Order ("TRO") and
preliminary injunction on December 27, 2024, which was denied on January 16, 2025.
(Docs. 8, 22.)  In denying Blue Compass's TRO, the Court explained that although Blue
Compass was likely to succeed on at least some of its claims, it failed to demonstrate the
remaining *Winter* factors.  (Doc. 22 at 7–14.)  Specifically, the Court held that Blue
Compass had not demonstrated that it was likely to be irreparably harmed, or that the
balance of the equities tipped in its favor.  (*Id.*)

Blue Compass filed its Renewed Application for a Preliminary Injunction on
October 29, 2025.  (Doc. 70.)  The application is fully briefed.  (Docs. 85, 89.)

---

[3]     In their Reply, (Doc. 89 at 7), Blue Compass states that LeDuc and McFadden used
the keyword "Blue Compass," but the referenced deposition testimony does not support
that statement.  (Doc. 70 at 67 (LeDuc testifying that "he didn't believe" they used the
words "blue" or "compass"); *id.* at 117 (McFadden listing the purchased keywords, which
did not include "Blue Compass").)

## II.    LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor, and" (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although "a stronger showing of one element may offset a weaker showing of another," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), a plaintiff must meet all four requirements to obtain relief, *see DISH Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir. 2011). Ultimately, a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (citation modified).

Before reaching the preliminary injunction factors, courts "must assure [themselves] that the constitutional standing requirements are satisfied." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). "Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." *Id.* The "burden of establishing Article III standing remains at all times with the party invoking federal jurisdiction." *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 655 (9th Cir. 2002).

Each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This means that, "at the preliminary injunction stage, the plaintiff must make a 'clear showing'" of standing. *Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2024) (cleaned up). This "clear showing" does not, however, depend on the merits of a plaintiff's claims. *See id.* Thus, in evaluating standing at the preliminary injunction stage, "[courts] ask—accepting the merits of [the plaintiff's] claims—whether they have made a clear showing that they are likely to satisfy the threshold requirements of standing." *Id.* at 1111.

## III.    DISCUSSION

### A.    Article III Standing

Because Blue Compass seeks injunctive relief, it must "demonstrate a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc) (quotation marks omitted).  A "person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021).  Thus, "[t]o obtain preliminary injunctive relief, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury." *Wolfe v. Logan*, 2023 WL 2347133, at *3 (C.D. Cal. 2023) (citation omitted).  "A preliminary injunction will do nothing to repair alleged past harms." *Id.*

In its Reply, Blue Compass emphasizes that its application for a preliminary injunction is "focuse[d] on McFadden's flagrant breaches of his agreement not to compete with Blue Compass for 12 months."  (*Id.* at 2 n.1.)  McFadden's employment with Blue Compass ended on November 30, 2024.  (Doc. 1 at ¶ 18.)  Pursuant to the parties' contract, the non-competition provision terminated one year later, on November 30, 2025.  (Doc. 20-1 at 5.)  Because the non-competition provision has expired, McFadden can no longer breach it, and any injury arising from its violation is a past injury for which injunctive relief is improper. *Cf. VSB Opco, LLC v. Snack Innovations, Inc.*, 2024 WL 4467594, at *6 (C.D. Cal. 2024) (holding that "given the expiration of the window of enforceability of the non-compete clause" preliminary relief was "unlikely").  Blue Compass thus lacks standing to pursue injunctive relief based on McFadden's violation of the non-competition clause.

In its proposed preliminary injunction, Blue Compass also seeks relief based upon McFadden's alleged violation of the non-solicitation and confidentiality provisions.  (Doc. 70 at 157–60.)  Because these provisions have yet to expire, McFadden's alleged breach is an ongoing injury, and Blue Compass has standing to seek a preliminary injunction enforcing them.

**B.    Preliminary Injunction Factors**

**1.    Likelihood of Success on the Merits**

In its January 16 order, the Court found that Blue Compass was likely to succeed on some of its claims.  The Court need not repeat that analysis here.  Even assuming Blue Compass is still likely to succeed on the merits, it has failed to meet its burden on the remaining *Winter* factors.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1378 (9th Cir. 1985) (holding that when a movant fails to demonstrate a "significant threat of irreparable injury . . . [courts] need not decide whether [movants] will eventually prevail in [their] claims"); *see also Goldwater Bank NA v. Caliber Home Loans Inc.*, 2021 WL 4593075, at *6 (D. Ariz. 2021) ("Because [Plaintiff] has failed to show likely irreparable harm, the Court need not address whether it is likely to succeed on the merits.").

**2.    Irreparable Harm**

"[E]conomic harm is not generally considered irreparable."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).  "The threat of being driven out of business," however, "is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable."  *hiQLabs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2021) (cleaned up).  Blue Compass does not argue that it faces the "threat of being driven out of business."  (*See generally* Docs. 70, 89.)  Nor does it present any evidence that the survival of any of its business—whether nationally, or locally—is threatened by McFadden and Camper Capital.  (*See id.*)

Rather, Blue Compass relies on "intangible harms" such as damage to "Blue Compass's reputation, future business expectancy, goodwill, and competitive position in the marketplace" and asserts that it will suffer irreparable harm because its damages are difficult to calculate.  (Doc. 89 at 5–6.)  Such harms may be grounds for a preliminary injunction.  *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) ("Evidence of loss of control over business reputation and damage to goodwill can constitute irreparable harm." (cleaned up)) *and Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023) (a finding of irreparable injury is appropriate "where the

underlying injury does not readily lend itself to calculable money damages").  But, as before, Blue Compass fails to present "specific evidence that its reputation and goodwill [are] likely to be irreparably harmed." (Doc. 22 at 11.)

To support its claim that it has now marshalled specific evidence of irreparable harm, Blue Compass points to LeDuc and McFadden's deposition testimony.  Blue Compass identifies the following testimony as demonstrating irreparable harm: (1) Leduc's testimony that "Camper Capitol's earliest commercial accounts—MHQ, Blue Sky Pest Control, Simply Green, Metro Fire, and Van Chevrolet—were contacts [LeDuc] developed while serving as Blue Compass's General Sales Manager and that Camper Capital continues to do business with them,"; (2) McFadden's testimony that he purchased Google keywords like "Camperland" and "truck shells" to direct internet traffic to Camper Capital's website; and (3)  McFadden's testimony that "'the Southwest market . . . was the only market that sold camper shells'" during his time at Blue Compass, and that Camper Capital's Phoenix/Peoria locations were within 100-miles of "overlapping" Blue Compass stores.  (Doc. 70 at 17–18.)[4]

While this testimony may bolster Blue Compass's claim that McFadden breached his contract and thus may bear on Blue Compass's likelihood of success on the merits, it does little to establish that Blue Compass was or will be harmed by the breach—let alone irreparably so.  As an initial matter, Blue Compass only seeks an injunction against McFadden, not LeDuc or Camper Capital.  (Doc. 70 at 2.)  Whether LeDuc is soliciting Blue Compass customers is therefore irrelevant to the present motion.  Even if the Court were to grant the requested relief, it would have no effect on LeDuc or Camper Capital.  It is thus unclear how the relief Blue Compass requests will remedy the harm they allege.

Further, Blue Compass does not explain how Camper Capital's purchase of Google keywords has had, or is likely to have, an impact on its goodwill, reputation, or customer

---

[4]    Blue Compass also argues that it faces "an ongoing loss of trade-secret secrecy and control of confidential financials."  (Doc. 70 at 18.)  But it fails to identify any new evidence not before the Court in its previous application for preliminary relief that would support this theory. It thus continues to lack the specific evidence required to support preliminary relief.

base; nor does it explain how enjoining McFadden will prevent LeDuc and Camper Capital from continuing to use the same keywords.  *See Realty Executives International, Inc. v. RE/EX California, Inc.*, 2009 WL 10673968, at *2 (D. Ariz. 2009) (denying injunctive relief where defendant did not "explain how [it was] losing good will among consumers as a result of the parties' agreement being terminated").  And finally, that McFadden is aware Camper Capital is competing with Blue Compass in the Southwest region is (1) not new evidence (*See* Doc. 22 at 9 ("It is undisputed that Blue Compass and Camper Capital are both in the camper shell business.")); and (2) does not demonstrate that Blue Compass's goodwill is threatened by Camper Capitol's business.

Blue Compass's only argument is a conclusory one: that "the impact of Blue Compass's loss of goodwill—reduced pricing power, diluted brand recognition, and permanent disruption to Blue Compass's customer accounts—cannot be measured through sales data." (Doc. 70 at 18.)  And yet, as discussed, there is no evidence in the record that Blue Compass's pricing power has been or will be reduced, its brand recognition diluted, or its customer accounts disrupted.  *Cf. adidas*, 890 F.3d at 756–57 (affirming district court's finding of irreparable harm where plaintiff submitted extensive testimony and evidence, including customer surveys, that it had cultivated a "specific reputation" and that a competing product was confusing consumers).

Finally, Blue Compass cannot rely on the difficulty of calculating damages for intangible injuries to cure its failure to demonstrate that it has, in fact, suffered intangible injuries.  (*See e.g.*, Doc. 70 at 18.)  It is true that when the "underlying injury does not readily lend itself to calculable money damages" injunctive relief may be appropriate, *Epic Games*, 67 F.4th at 1003, but to take advantage of incalculable damages, Blue Compass must show that it will suffer an underlying injury.  *See Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (affirming district court's finding of irreparable harm where the plaintiff demonstrated harm to "advertising efforts and goodwill" and "damages would be difficult to valuate").  It has failed to do so, and a preliminary injunction is therefore improper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Balance of the Equities and Public Interest

The lack of irreparable harm is fatal to Blue Compass's request for relief.  The Court need not address the remaining *Winters* factors, but notes that the analysis in its prior order still stands.

Accordingly,

**IT IS ORDERED** denying the Renewed Application for a Preliminary Injunction, (Doc. 70).

Dated this 22nd day of December, 2025.

Honorable Sharad H. Desai
United States District Judge